## Salkeld v. Pennsylvania Railroad Company, Appellant.

Argued April 23, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

before RICHARDSON, THOMPSON and MARSHALL, JJ., opinion by MARSHALL, J.

*John R. Bredin,* with him *Dalzell, McFall & Pringle,* for appellant.

*J. Thomas Hoffman,* for appellee.

OPINION BY RHODES, J., October 4, 1940:

Claimant filed a claim petition for compensation for the death of her husband in the course of his employment with defendant on December 18, 1936. The testimony in support thereof was virtually undisputed. The defense made to the claim was that deceased was engaged in interstate transportation at the time of his death, so that claimant's remedy was to be found under the Federal Employers' Liability Act, exclusively. The referee made an award in claimant's favor. The Workmen's Compensation Board affirmed the findings of fact, conclusions of law, and award of the referee. Defendant's appeal to the court of common pleas was dismissed, and judgment was entered on the award in favor of claimant. Defendant has appealed from the judgment, and has submitted six assignments of error, all relating to the single question of the character of deceased's employment at the time of his death.

The testimony discloses that deceased was a brakeman, who for six months prior to his death had been regularly assigned to a freight train described as P. T. 21. This train was made up daily in the Pitcairn yards of appellant company, and consisted of cars to be de-

livered at various points between Pitcairn and 43d Street in the city of Pittsburgh. The train never left this state, but the cars of which it ultimately consisted on the night in question contained less than carload shipments from points of origin outside Pennsylvania. Deceased was regularly assigned to the front end of the train, and on the evening of December 18, 1936, registered at the west end of the yard at 7:05 p. m. He then went to the caboose which was to accompany train P. T. 21, changed his clothes, lighted his lantern, and left. Two or three minutes later he was found dead under the second car forward from the caboose. There had been four cars coupled to the caboose before deceased arrived, and five more were added between the time he left the caboose and the accident. His first duty was to have been the coupling of the engine to the head of the train after it was made up. The engine, at the time of deceased's death, had not arrived. The making up of the train was the task of the shifting crew, not the train crew, and the precise composition of the train would not have been finally determined until the manifest was completed, which had not been done at the time in as much as the conductor was at the yard office working on it. The manifest was the document identifying the individual cars which would compose the train as it left the yard for its destination. When this train finally left the Pitcairn yards it contained eleven cars.

From the circumstances described in the testimony which we have summarized, it is plain that the instrumentality of transportation to which deceased was assigned when made up was, at the time of his death, in the process of being assembled, and could not have assumed its final character, whether interstate or exclusively intrastate, until that process was completed. Deceased was not among that class whose duties are so indiscriminately concerned with both classes of service

as to be inseparable, and therefore interstate, as in *Mason. v. Reading Co.*, 129 Pa. Superior Ct. 289, 195 A. 754; *Sigler v. Pittsburgh & Lake Erie Railroad Co.*, 127 Pa. Superior Ct. 458, 193 A. 362; *Velia v. Reading Co.*, 124 Pa. Superior Ct. 199, 187 A. 495.

In *Mease et al. v. Reading Co.*, 126 Pa. Superior Ct. 436,[1] at page 440, 191 A. 402, at page 404, in an opinion by Judge PARKER, we said: "At the outset it is to be noted that a member of a shifting crew does not ordinarily belong to that class of employees of railroad carriers whose service is so related to an instrumentality of transportation as to be practically inseparable from the use of that instrumentality in moving traffic, such as a flagman at a crossing over which interstate and intrastate traffic passes (*Phila. & Reading R. Co. v. Di Donato*, 256 U. S. 327, 41 S. Ct. 516), or one engaged in repairing tracks or bridges (*Pedersen v. D., L. & W. R. R. Co.*, 229 U. S. 146, 33 S. Ct. 648), or a railroad policeman (*Elder v. Penna. R. R. Co.*, 118 Pa. Superior Ct. 137, 180 A. 183). A fireman on a shifting crew may at times be engaged exclusively in either interstate or intrastate transportation: *Ill. Cent. R . R. v. Behrens*, 233 U. S. 473, 34 S. Ct. 646." In that case the deceased employee's superiors had already determined that he was to receive an assignment to interstate transportation, but he had not received those instructions, and we held the mere expectation to be called upon to perform a task in interstate transportation insufficient to characterize his services at that point. Likewise, in *Reese v. Pennsylvania Railroad Co.*, 118 Pa. Superior Ct. 112, 180 A. 188, the deceased, a fireman, had been "marked up" for duty on an interstate train by a superior, but this order had not been transmitted to him, and could

---

[1] An allocatur was refused by the Supreme Court of Pennsylvania, and petition for writ of certiorari to the Supreme Court of the State of Pennsylvania was denied by the Supreme Court of the United States. 302 U. S. 705, 82 L. Ed. 545.

not have become final until he appeared and "signed the register sheet." We held that those circumstances amounted only to a tentative direction subject to change, indicative of a mere intention to assign him to interstate service, and until communicated insufficient to place him in interstate transportation; and that the trip did not take on its characteristic until some move was made in performing the act to be done.

The circumstance in the present case, that the train P. T. 21 as finally constituted on this occasion was a vehicle of interstate commerce, appears of no greater weight than the designations which were planned but never carried out as to the duties of the deceased employees in the Mease and Reese cases, supra. As a unit of commerce, whether interstate or intrastate, the train P. T. 21 was not even in being when deceased met his death; it was less than half assembled. Later exigencies might show that the cars would be utilized for one purpose or the other, but at the time of deceased's death there was no preponderance of probability that the later movement would be one in interstate or intrastate transportation. See *Carey v. New York Central Railroad Co.*, 250 N. Y. 345, 165 N. E. 805. The character of the only instrumentality of transportation to which he had an assignment was as yet indeterminate.[2] The movement of the train, however, was to be confined to the state. Since deceased's first duty was to couple the road engine to the head of the complete train, he could not at the time of his death have been engaged in a forward movement to serve in interstate transportation. This is the test of his engagement in interstate commerce. "Employment follows interstate transportation and begins when the workman, on a carrier's premises,

---

[2] The unassembled cars had no interstate character as did the train in *Miller v. Lehigh Valley Railroad Co.*, 138 Pa. Superior Ct. 8, 9 A. 2d 917, and in *Libertucci et al. v. New York Central Railroad Co.*, 252 N. Y. 182, 169 N. E. 132.

makes a forward move to serve in that traffic or employment and ends only after he has completely dissociated himself therefrom. Interstate employment follows such character of commerce, if the instrumentality is wholly or partly engaged therein": *Koons et ux. v. Philadelphia & Reading Ry. Co.*, 271 Pa. 468, at page 470, 114 A. 262, at page 263.

Judgment is affirmed.